# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

**Civil Action No.: 1-25-cv-2568**

**R.Z.**
      **Plaintiff,**

**vs.**

**RK Hospitality, LLC d/b/a Travel Lodge by Wyndham;**
**Msoiur Rahman d/b/a Travel Lodge by Wyndham;**
**Value Inn Inc. d/b/a Value Inn & Suites;**
**Rileshkumar R. Patel d/b/a Days Inn;**
**Haiden LLC d/b/a America's Best Value Inn;**
**Sonesta International Hotels Corporation;**
**Red Lion Hotels Corporation; Days Inn Worldwide,**
**Inc.; Wyndham Hotels & Resorts, Inc.;**
**ABC Corporation 1-100; and John Does 1-100,**

      **Defendants.**

---

## COMPLAINT AND JURY DEMAND

---

## I.

## PRELIMINARY STATEMENT

1.    Plaintiff R.Z. respectfully brings this case for damages against Defendants who were instrumental, if not necessary, participants in a sex trafficking venture that took away over a decade of her life.

2.    This case seeks to hold accountable the hotels, motels, and their respective franchisors that knowingly benefited from the horrors inflicted on Plaintiff by providing the place and opportunity for her near-daily exploitation at the hands of her trafficker, B.S.

3.      Plaintiff was forced into the life of involuntary sexual servitude, violence, and drug dependency by B.S., a notorious sex trafficker. B.S. persistently threatened, intimidated, manipulated, and drugged Plaintiff to keep her compliant, until one day when she escaped after he attempted to murder her, the police intervened, and he was sent to prison for the assault.

4.      Defendants, through their hotels, motels, and franchise relationships, knowingly and repeatedly provided the venues for Plaintiff's exploitation, turning a blind eye to obvious signs of trafficking and, in many instances, actively facilitating the trafficking scheme because it was in their financial interests to do so. Other perpetrators of and participants in these crimes will be held to account in different ways and in different fora.  Defendants' actions and omissions enabled and perpetuated Plaintiff's victimization, for which they are liable under federal and state law.

## II.

## <u>THE PARTIES</u>

5.      Plaintiff R.Z. is a citizen of Colorado. Due to the sensitive, private, and demonstrably retaliatory nature of the allegations contained herein, Plaintiff requests this District Court grant a protective order pursuant to *Federal Rule of Civil Procedure* 26(c) to permit her to proceed under a pseudonym and to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit and thereafter.[1] Plaintiff also intends to file a formal motion

---

[1] B.S. trafficked Plaintiff as an adult from approximately the Spring of 2014 until August 2015. In addition to being a victim of a "severe form[] of trafficking" as it is defined under 22 U.S.C.S. §7102(11), Plaintiff was also "caused to engage in commercial sex act[s]" for a decade. *See* 18 U.S.C.S. §1591(a). Federal law considers victims of sex trafficking to be the victims of organized crime entitled to witness protection. *See* 18 U.S.C. § 1594(g) ("Witness Protection - Any violation of this chapter shall be considered an organized criminal activity or other serious offense for the purposes of application of chapter 224"). In cases where the Plaintiff has demonstrated a need for pseudonymity, such as "'cases involving matters of a highly sensitive and personal nature,  real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity[,]'"  the district court may use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b) and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c) to preserve the party's anonymity without prejudicing the

to proceed under a pseudonym after completing service of the Complaint on Defendants so as to determine whether the Defendants would oppose Plaintiff's request to proceed under a pseudonym.

6.      Defendant RK HOSPITALITY, LLC d/b/a TRAVEL LODGE BY WYNDHAM was a hotel venture located at 2625 Ore Mill Road, Colorado Springs, Colorado 80904 from approximately June 2014 to 2021.

7.      Defendant MOSIUR RAHMAN d/b/a TRAVEL LODGE BY WYNDHAM was a hotel venture located at 2625 Ore Mill Road, Colorado Springs, Colorado 80904 from approximately 2009 to 2014.

8.      Defendant VALUE INN INC. d/b/a VALUE INN & SUITES was a hotel venture located at 6875 Space Village Ave., Colorado Springs, Colorado 80915 from approximately 2007 to 2019.

9.      Defendant RILESHKUMAR R. PATEL d/b/a DAYS INN was a hotel venture located at 2409 East Pikes Peak Avenue, Colorado Springs, Colorado 80909 from approximately 2008 to 2021.

10.     Defendant HAIDDEN LLC d/b/a AMERICA'S BEST VALUE INN was a hotel venture located at 1780 Aeroplaza Drive, Colorado Springs, Colorado 80916 from approximately 2012 to 2021.

11.     Defendant SONESTA INTERNATIONAL HOTELS CORPORATION was the franchisor and principal of Defendant HAIDDEN LLC D/B/A AMERICA'S BEST VAULE INN during the relevant timeframe.

---

opposing party's ability to litigate the case. *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000) (quoting *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992)).

12.     Defendant RED LION HOTELS CORPORATION was the franchisor and principal of Defendant VALUE INN INC. d/b/a VALUE INN & SUITES  and during the relevant timeframe.

13.     Defendant DAYS INN WORLDWIDE, INC. was the co-franchisor and co-principal of Defendant RILESHKUMAR R. PATEL d/b/a DAYS INN BY WYNDHAM.

14.     Defendant WYNDHAM HOTELS & RESORTS, INC. was the franchisor of and principal of Defendant RK HOSPITALITY, LLC  d/b/a TRAVEL LODGE BY WYNDHAM, Defendant MOSIUR RAHMAN d/b/a TRAVEL LODGE BY WYNDHAM, and Defendant RILESHKUMAR R. PATEL d/b/a DAYS INN BY WYNDHAM.

15.     Defendants ABC CORPORATIONS 1-100 and JOHN DOES 1-100 are currently unknown. The true names and capacities of the Defendants ABC Corporations 1- 100 or JOHN ROES 1-100 are unknown to Plaintiff at the time of filing this Complaint, and Plaintiff, therefore, sues said Defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes, and therefore alleges, that each of the ABC Corporations and John Roe Defendants are, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to Plaintiff as herein alleged.

### III.

### <u>JURISDICTION & VENUE</u>

16.     This Court has original and supplemental subject matter jurisdiction over this matter under 28 U.S.C. § 1331, 18 U.S.C. § 1595(a), and 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over all Defendants because they are citizens of Colorado or regularly conduct business in California, and because their acts or omissions that occurred in Colorado gave rise to the causes of action asserted herein.

18.     Venue is proper in this District because Plaintiff was trafficked in this District, the acts giving rise to this action occurred in this District, and Plaintiff and each Defendant are domiciled in this District or regularly conduct business within this District.

## IV.

## BACKGROUND FACTS

### A.   PLAINTIFF IS LURED INTO AND FORCED TO PARTICIPATE IN A LIFE OF SEX TRAFFICKING

19.     In the Spring of 2014, Plaintiff was left homeless after breaking up with her significant other.

20.     She checked into the Value Inn & Suites ("Value Inn"), located at 6875 Space Village Avenue in Colorado Springs, where she planned to stay for a few days until she could find a more permanent housing solution.

21.     While staying at the Value Inn she met and established a rapport with S.A., who appeared to be of Native American descent, approximately 5'2" tall, about 100 pounds, and looked to be in her fifties.

22.     During their conversations, Plaintiff shared with S.A. that her breakup had left her homeless, jobless, and rapidly running out of money.

23.     About a week after their first encounter, S.A. invited Plaintiff to visit her at her cottage home, which was about five miles away from the Value Inn.

24.     There, S.A. introduced Plaintiff to B.S., who was approximately 5'8" tall, 170 pounds, and appeared to be of Hispanic origin.

25.     S.A. had apparently told B.S. about her conversations with Plaintiff, because when Plaintiff met B.S., he was already aware that Plaintiff was low on cash and in need of money, a job, and a place to stay.

26.     B.S. told Plaintiff that he could help her get back on her feet, get her own apartment, and help her find a job, but in return, Plaintiff would have to temporarily go on "dates" with men in exchange for money, while he helped Plaintiff get back on her feet.

27.     Plaintiff, who was in desperate need of money on a sheer survival level and desperate to regain her independence, but unsure about how to go about doing so without any resources whatsoever, reluctantly agreed.

28.     What began as a desperate agreement purportedly to help Plaintiff, rapidly devolved into forced prostitution and sex trafficking that only benefited and enriched others.

29.     Almost immediately, B.S. began to exercise complete control over Plaintiff.

30.     B.S. was always armed with both a gun and blackjack or club. Soon after falling into B.S.'s clutches, Plaintiff told B.S. she no longer wanted to sleep with men for money. In response, B.S. threatened to beat her at any mention of leaving.

31.     B.S. forced Plaintiff to live in a string of hotels, where he required her to sleep with multiple men a day in exchange for money.

32.     B.S. isolated Plaintiff. He demanded that she remain in her assigned hotel room, alone at all times, except when he was transporting Plaintiff to or from another hotel to provide commercial sex.

33.     Plaintiff was completely isolated. Her human interaction was largely limited to B.S., the commercial sex customers, and limited encounters with hotel staff when checking into a hotel. On occasion, Plaintiff would interact with some of the other women that B.S. trafficked, but they were in the same boat she was and therefore did not have the means or ability to help her. Otherwise, at B.S.' insistence, Plaintiff remained alone a hotel room waiting for the next customer or for B.S. to transport her to a new location.

34.     One time, when she was staying at the Travel Lodge by Wyndham located at 2625 Ore Mill Road in Colorado Springs, she told B.S. that she was leaving him and the situation he caused her to be in. He beat her, giving her a black eye and other visible body bruises. He then forced her to stay in her room at that hotel for two-weeks straight with no in-person human interaction while the bruises healed.

35.     As time passed, B.S. became increasingly violent with Plaintiff.  In August 2015, while she was staying at the America's Best Value Inn located at 1780 Aeroplaza Dr. in Colorado Springs, Plaintiff once again told B.S. that she could not continue with the enslavement and abuse

and she was leaving. B.S. then punched Plaintiff so hard in the nose that she was thrown off her chair. He continued to beat and then strangled her to the point of unconsciousness.

36.	When she came to, B.S. was gone. Plaintiff immediately tried to use her hotel room phone to call 911, but it was inoperable. She managed to work her way to the front desk of the hotel, where she asked the two employees there to call 911. They told her that they didn't want to "interfere in [B.S.'s] business" and they refused to call 911.

37.	She limped back to her hotel room, where she hid in the closet overnight while in complete terror that B.S. would come back and kill her.

38.	In the morning, she went to the front desk again and, fortunately, there was a different employee there who called 911.

39.	Plaintiff was transported by ambulance to the hospital, where she remained for three days. She stuttered for nearly three months as a result of this particular beating. The stuttering was only brought under control with extensive speech therapy.

40.	The police arrested B.S. for this assault and he was eventually convicted and imprisoned. To this day, Plaintiff remains terrified that he will track her down and kill her for reporting the assault to the police.

41.	In addition to the physical scars she suffered from this beating, Plaintiff has suffered permanent mental scars from the trauma of her trafficking.

42.	Plaintiff experienced prolonged and severe psychological trauma as a direct result of her trafficking, which fundamentally altered her ability to process information, assess legal options, and recognize her right to seek justice.

43.	Scientific research on sex trafficking victims demonstrates that chronic exposure to trauma, coercion, and psychological manipulation can disrupt cognitive processing, leading to long-term deficits in decision making, memory, and comprehension of one's legal rights.

44.	Studies show that trafficking victims experience heightened levels of cortisol and other stress hormones, which impair the brain's ability to process risk, recall information, and make complex decisions, particularly those involving self-advocacy and legal recourse.

45.     A polyvictim is a person who has endured multiple forms of victimization—such as physical violence, sexual abuse, psychological coercion, and social isolation.

46.     The cumulative impact of polyvictimization compounds psychological distress, impairing a polyvictim's ability to take legal action and exacerbating feelings of helplessness.

47.     Victims of polyvictimization often experience severe emotional dysregulation, difficulty trusting authority figures, and an inability to advocate for themselves.

48.     Traffickers often employ entrapment and enmeshment schemes that manipulate their victims' perception of reality, fostering dependence on their exploiters while simultaneously eroding their sense of self and agency.

49.     Victims of human trafficking commonly develop learned helplessness, a psychological state in which repeated victimization conditions an individual to believe that seeking help is futile or will result in further harm.

50.     While she was trafficked, Plaintiff was subjected to ongoing physical abuse, threats, coercion, and intimidation that prevented her from asserting her rights. B.S. ensured Plaintiff's compliance through violence, threats of death, psychological manipulation, and forced drug use, rendering Plaintiff incapable of seeking legal recourse or recognizing the viability of his claims.

51.     Plaintiff was subjected to ongoing threats, intimidation, and coercion by her trafficker, which instilled a persistent fear of retaliation that continued long after the exploitation ended, discouraging her from taking legal action.

52.     On information and belief, Plaintiff suffered one or more of these psychological injuries.

53.     As a result, Plaintiff did not recognize the full extent of her legal rights or the involvement of the Defendants in facilitating her exploitation until recently.

54.     On information and belief, the extreme and sustained trauma Plaintiff endured fundamentally altered her brain function and decision-making abilities, as evidenced by research demonstrating that long-term exposure to trafficking environments disrupts neural pathways related to judgment, reasoning, and the ability to take independent action.

55.      Due to this conditioned response, Plaintiff did not believe that pursuing legal claims against the Defendants was a viable option until she was able to receive legal assistance.

56.      Further, Defendants' active concealment of their participation in and benefit from sex trafficking prevented Plaintiff from discovering their culpability. Defendants failed to take action on clear indicators of trafficking occurring on their premises. Plaintiff, lacking access to information about her legal rights while also suffering from severe psychological trauma, was unaware that she had claims against Defendants until recently.

57.      Plaintiff has acted diligently since learning of her legal rights to seek justice. Upon escaping her traffickers and reaching a place of relative safety, Plaintiff began working to rebuild her life. However, her ability to understand and pursue legal action was severely impaired by the psychological harms she suffered. Only recently, with the assistance of counsel, did Plaintiff become aware of the extent of Defendants' participation in her trafficking and their potential liability under the law.

## B. DEFENDANTS KNOWINGLY BENEFITTED FROM THE TRAFFICKING OF PLAINTIFF

### 1. Common Allegations

58.      Due to restrictions on how long anyone can stay at a hotel under Colorado law before they are considered a resident and likely due to other limitations, B.S. would circulate his victims among different hotels each month.

59.      Owner/operators or employees of each Defendant were intimately familiar with B.S. and his trafficking of Plaintiff and other women.

60.      Indeed, many hotels, motels, inns, and other short-term commercial rental facilities within the hospitality industry that are intended for overnight stays knowingly derive a significant portion of their income from the sex trade. They could scarcely continue to exist without it and each relies on the other hotels to sustain their business model. As long as sex traffickers have another hotel to stay at for a while, every hotel can be confident that the sex trafficking groups will be back on a cyclical basis.

61.     As longer stays at any one hotel risk violating state laws about length of stay and invite greater scrutiny from local law enforcement, a constant flow of sex traffickers like B.S. and even sex trafficking groups allow hotel owners to confidently earn consistent revenue while avoiding detection.

62.     Upon information and belief, owner/operators of each Defendant hotel utilized technology for things like booking, customer complaints and notes, customer review surveys, banking, and accounting, among other things.

63.     Thus, the hotels and hotel owners are part of a single informal conspiracy or, alternatively, a joint enterprise.

## 2.   Allegations pertaining to Value Inn & Suites

64.     Upon information and belief, during the times that Plaintiff was trafficked at 6875 Space Village Avenue, Colorado Springs, Colorado 80915—the Value Inn & Suites was owned, operated, or controlled by Defendant Value Inn Inc. and was franchised by Defendant Red Lion Hotels Corporation. ("Red Lion") or one of its affiliates.

65.     Defendant Value Inn Inc., along with Defendant Red Lion Hotels Corporation, the Value Inn & Suites, and the unnamed and unidentified employees thereof ("Value Inn Defendants") formed a business venture that participated in B.S.'s sex trafficking scheme and very likely other similar schemes. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting personnel, and managers.

66.     At all relevant times, the above the Value Inn Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

67.     At all relevant times, the Value Inn Defendants had a continuous or repetitive business relationship with B.S., wherein they rented multiple rooms to B.S. at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

68.     The Value Inn is laid out such that one must pass the front desk to access any of the rooms, giving the hotel employees plain view and direct knowledge of the trafficking circumstances.

69.     Plaintiff was first trafficked at the Value Inn in or around the Spring of 2014.

70.     The Value Inn was B.S.'s main location and treated as the primary headquarters for B.S.'s sex trafficking enterprise.

71.     B.S. consistently rented several rooms at a time at this hotel.

72.     The front desk staff were familiar with B.S. and referred to him by name.

73.     Plaintiff witnessed B.S. pay for rooms in cash and provide cash tips to the hotels' front desk employees.

74.     The front desk staff also helped facilitate the trafficking. For instance, when B.S. transported R.Z. from another hotel to the Value Inn, he would often drop her off in front of the hotel, then R.Z. would go to the front desk and be handed a key to a room without having to pay, which was prearranged by the staff.

75.     The Value Inn employee Defendants, however, did not treat R.Z. like a guest of the hotel. R.Z. was not allowed to stand in line with other guests at the front desk. Instead, she was made to wait in a corner the lobby until the front desk cleared of all other guests before the staff would interact with her.

76.     Additionally, the owner of the hotel must have known of the sex trafficking venture because on two occasions B.S. arranged for the hotel owner  to have sex with R.Z. in her room.

77.     There was no way for the front desk personnel not to have noticed that Plaintiff was a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

   a.  On at least a dozen occasions, B.S. booked multiple rooms as a block and paid for them together or bartered sex with the victims for the rooms;

   b.  B.S. brazenly stalked the hallways armed with a gun and club going from room to room to monitor his victims;

   c.  B.S. frequently collected cash in the hotel's hallways or near the rooms used for his sex trafficking scheme;

d.  Plaintiff was emaciated and her interactions with other people or with hotel staff were strictly limited;

e.  Plaintiff was dressed provocatively because she was forced to do so;

f.  On each occasion, unregistered male visitors entered Plaintiff's room (and the other rooms in the block purchased by B.S.) one by one throughout the day, either after walking by the front desk or through the back door when the hotel left it unlocked, but always in full view of the hotel's cameras;

g.  Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

h.  The cleaning staff provided significantly more linens and towels to Plaintiff's room when she was staying there than they would provide to a typical hotel guest; and

i.  B.S. frequently precluded hotel staff from entering the rooms while the sex trafficking transactions were occurring and when the hotel staff eventually entered the rooms as permitted by B.S., they must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia.

78.     The Value Inn was franchised by Defendant Red Lion Hotels Corporation or its affiliates (hereinafter "Red Lion Franchisors), during the time the Plaintiff was trafficked at the location.

79.     As part of the franchisor/franchisee contractual relationship, the Red Lion Franchisors exercised substantial control over Defendant Value Inn Inc. as their franchisees and is and are equally and measurably responsible for and have the contractual right to, among other things:

a.  Create and define the safety standards that franchisees (i.e., Value Inn Inc.) are supposed to maintain;

b. Clearly communicate those standards to franchisees (i.e., Value Inn Inc.);

c. Create the materials for training franchisees (i.e., Value Inn Inc.) and their employees;

d. Provide some or all training to franchisees (i.e., Value Inn Inc.) and/or their employees;

e. Enforce the standards that franchisees (i.e., Value Inn Inc.) are to maintain;

f. Hold the franchisees (i.e., Value Inn Inc.) to the standards that franchisees are to maintain; and

g. Terminate and replace non-compliant franchisees (i.e., Value Inn Inc.).

80. Because of this relationship, the Red Lion Franchisors had the right to control and in fact did control whether Defendant Value Inn Inc., or its other franchisees take reasonable actions to prevent sex trafficking.

81. The Red Lion Franchisors received financial benefits from the renting of rooms and use of facilities at their sponsored franchisee (i.e., Value Inn Inc..) locations because of royalties, rents, and other monies subject to the Red Lion Franchisors' contractual relationship with Defendants, Value Inn Inc., or other franchisees.

82. The Red Lion Franchisors provided materials to educate and train their franchisees, including Value Inn Inc., about warning signs associated with sex trafficking within the hotels, and upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of Value Inn Inc., and other franchisees.

83. The Red Lion Franchisors, upon information and belief, had a tacit agreement with B.S. to allow Value Inn, Inc.'s venture with B.S. and for Value Inn, Inc. to continue participating in the venture for the Red Lion Franchisors to continue profiting from B.S.'s exploitation of the Plaintiff and other women at the Red Lion Franchisors' franchisee locations, including Value Inn Inc..

84. The failure of the Red Lion Franchisors to identify probable sex trafficking is due solely to an active decision to maintain a blind eye toward it, intentionally not taking measures to

educate and train franchisees, including Value Inn Inc., on how to spot sex trafficking and then by knowingly taking no action to ensure that those measures are deployed at the franchise facilities.

85.     Upon information and belief, the Red Lion Franchisors regularly sent inspectors, both for planned and unplanned visits, to review, inspect, investigate, and maintain the premises operating as franchisees, including Value Inn Inc., to ensure compliance with all Choice Franchisors standards and policies, including the sex trafficking prevention policies.

86.     Upon information and belief, the Red Lion Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions that would have highlighted the fact that the hotels were home to rampant prostitution (or if the Wyndham Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including Value Inn Inc.. and its employees, targeted questions as part of their reviews to identify whether employees had seen any signs of prostitution or sex trafficking; or (c) survey the franchisees' guest population and activities for the same purposes.

87.     These are reasonable steps that likely would have stymied or ended the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Red Lion Franchisors never undertook any of these reasonable steps.

88.     The Red Lion Franchisors are part of the "ventures" network among several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at the Value Inn location, and also failing to provide proper sex trafficking education and training, much lesssupervision and accountability to their franchisees, including Value Inn Inc., thereby providing actual and constructive knowledge of and responsibility for sex trafficking activities, which include but are not limited to B.S.'s sex trafficking of Plaintiff at the Value Inn Defendants' location, or the other franchisee locations.

89.     The Red Lion Franchisors participated in a venture with B.S. by permitting B.S. to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through her constant physical and mental abuse in the presence of hotel employees at the franchisee locations, including the Value Inn Defendants, while continually profiting from B.S.'s sex trafficking activity from the ongoing venture.

90.    The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

91.    These commonsense inquiries should have been obvious to the Defendants, including Value Inn Inc., but also to the Red Lion Franchisors at all times, if they intended to prevent and end sex trafficking in their hotels.

92.    The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking."

93.     The Red Lion Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what steps the Red Lion Franchisors will start taking to combat it more effectively.

94.     The Red Lion Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.

95.     However, it still does not appear that much of what the Red Lion Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including this Value Inn & Suites, through at least 2015 as the Red Lion Franchisors permitted the venture to continue so they could continue benefiting financially from B.S.'s actions.

96.     The Red Lion Franchisors' lack of action permitted B.S. to continually coerce, abuse, and exploit victims, including Plaintiff, to allow the venture to continue so that the Red Lion Franchisors could continue to profit.

97.     The Red Lion Franchisors' lack of action to stop B.S. and active participation in the venture, despite the Red Lion Franchisors' publicized stance that glaringly conflicts with their knowledge of sex trafficking at their franchised locations, including Value Inn Inc., have enabled Plaintiff and other trafficked women to be injured emotionally, mentally, and physically on the Red Lion Franchisors' franchised premises.

98.     The Red Lion Franchisors have known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability to do something about it.

99.     As such, it was incumbent on the Red Lion Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to B.S. and his sex trafficking venture and likely other sex trafficking ventures—instead of playing an integral role in the life cycle of sex trafficking over the years—and take reasonable steps to prevent their franchisees, such as Value Inn Inc., from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

100.    Upon information and belief, the Red Lion Franchisors sent inspectors annually to grade each hotel, including the Value Inn Defendants. Those in-person inspections would have

alerted the Red Lion Franchisors to the above-outlined signs of sex trafficking at all relevant times. Those inspectors should have known and should have been trained to recognize that the hotels, including the Red Lion Defendants, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors who acted as agents of the Red Lion Franchisors were provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including the Value Inn Defendants, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the Red Lion Franchisors obviously enabled the hotels' continued sex trafficking venture with B.S.

101.    Furthermore, Defendant Value Inn Inc.'s hotel venture and each of the Red Lion Franchisors used interstate interactive technology to book rooms, communicate with franchisees, including the Value Inn Defendants, about bookings, process financial transactions for the rooms, communicate online advertisements and reviews about the hotel, facilitate customer and guest surveys, take and collect payments and fees, communicate standards and reviews, and perform assessments regarding the hotel's compliance with the Red Lion Franchisors' franchisees, including Value Inn, among other similar things.

### 3.  Allegations pertaining to Days Inn by Wyndham

102.    Plaintiff was trafficked at the Days Inn by Wyndham located at 2409 East Pikes Peak Avenue, Colorado Springs, Colorado 80909 ("Days Inn") in or about 2014 and 2015. B.S., Plaintiff, and the others involved in B.S.'s sex trafficking group stayed at this facility for a total of approximately 45 days during the period that Plaintiff was trafficked.

103.    Upon information and belief, during the times that Plaintiff was trafficked, the Days Inn was owned, operated, or controlled by Defendant  Rileshkumar R. Patel. The Days Inn was franchised by Defendant Wyndham Hotels & Resorts Inc. ("Wyndham") or one of its affiliates.

104.    Defendant Rileshkumar R. Patel, along with Defendant Wyndham as franchisors, the Days Inn , and the unnamed and unidentified employees thereof ("Days Inn Defendants") formed a business venture that knowingly and purposefully participated in B.S.'s sex trafficking scheme. The hotel employees involved in B.S.'s sex trafficking scheme include, but are not limited

to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

105. At all relevant times, the above Days Inn Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

106. At all relevant times, the Days Inn Defendants had a continuous or repeat business relationship with B.S. wherein B.S. simultaneously rented multiple rooms as a block to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating in a sex trafficking scheme and thus were the victims of sex trafficking.

107. At all relevant times, there were and still are cameras throughout the hotel's public areas, including its hallways.

108. The Days Inn Defendants must have had actual or constructive knowledge about the trafficking because, on multiple occasions, B.S. arranged with the owner/manager of the hotel to have sex with Plaintiff. Plaintiff distinctly remembers that the owner/manager smelled so bad that she rubbed Vicks vapor Rub under her nose to mask the smell. B.S. also forced his other victims to sleep with the owner/manager.

109. It was impossible for the hotel personnel, if properly trained or managed, not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited obvious signs of being trafficked, including but not limited to:

      a. On at least a dozen occasions, multiple rooms were booked as a block, typically under B.S.'s name, booked by B.S. alone, and paid for by B.S.;

      b. B.S. would stand guard outside the rooms, inside and outside of the hotel and always on the hotel property, obviously armed;

      c. B.S. would frequently collect cash from his customers on the hotel property immediately outside the rooms where his victims, including Plaintiff, were forced to provide commercial sex;

      d. Plaintiff and other of B.S.'s victims were emaciated;

      e. Plaintiff was dressed provocatively (by force);

f.  On each occasion, unregistered male visitors (typically two to three a day) entered Plaintiff's room (and the other rooms) one by one throughout the day, in full view of the hotel's cameras;

g.  Plaintiff was typically drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity; and

h.  When they eventually entered the rooms rented by B.S., the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia.

110.    The Days Inn was franchised by Defendants Wyndham or its affiliates (hereinafter "Wyndham Franchisors"), during the time that the Plaintiff was trafficked at the above-described location.

111.    As part of the franchisor/franchisee contractual relationship, the Wyndham Franchisors did and still do exercise substantial control over Defendant Rileshkumar R. Patel, depending on the applicable timeframe, as their franchisee and is responsible for and has the contractual right to, among other things:

a.  Create and define the safety standards that franchisees (i.e., Rileshkumar R. Patel) are supposed to maintain;

b.  Clearly communicate those standards to franchisees (i.e., Rileshkumar R. Patel);

c.  Create the materials for training franchisees (i.e., Rileshkumar R. Patel) and their employees;

d.  Provide some or all training to be delivered to franchisees (i.e., Rileshkumar R. Patel) and/or their employees;

e.  Enforce the standards that franchisees (i.e., Rileshkumar R. Patel) are to maintain;

f.  Hold the franchisees (i.e., Rileshkumar R. Patel) to the standards that franchisees are to maintain; and

g.  Terminate and replace non-compliance franchisees (i.e., Rileshkumar R. Patel).

112.  Because of this relationship, the Wyndham Franchisors have the right to control and in fact do control whether Defendant Rileshkumar R. Patelor their other franchisees take reasonable actions to prevent sex trafficking.

113.  The Wyndham Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisees (i.e., Rileshkumar R. Patel) locations because of royalties, rents, and other monies subject to the Wyndham Franchisors' contractual relationship with Defendants, Rileshkumar R. Patel, or other franchisees.

114.  The Wyndham Franchisors provide materials to train their franchisees, including Rileshkumar R. Patel, about the warning signs for sex trafficking within the hotels, and upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of Rileshkumar R. Patel, and other franchisees.

115.  The Wyndham Franchisors, upon information and belief, had a tacit agreement with B.S. to allow their venture with B.S. and to continue participating in the venture to continue profiting from the exploitation of the Plaintiff and other women by B.S. at the Wyndham Franchisors' franchisee locations, including Rileshkumar R. Patel.

116.  The failure of the Wyndham Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including Rileshkumar R. Patel, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

117.  Upon information and belief, the Wyndham Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the Wyndham Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including Rileshkumar R. Patel, and their employees questions as part of their reviews to identify whether they had seen any signs

of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

118.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Wyndham Franchisors did nothing for eons.

119.    The Wyndham Franchisors are part of the "ventures" involving several hotels— owning and operating some during the relevant period that Plaintiff was trafficked at the Rileshkumar R. Patel location, but also providing the training and supervision to their franchisees, including Rileshkumar R. Patel, thereby providing actual and constructive knowledge for the activities including B.S.'s sex trafficking of Plaintiff at Rileshkumar R. Patel, or the other franchisee locations.

120.    The Wyndham Franchisors participated in a venture with B.S. by permitting B.S. to continue her sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through her constant physical abuse in the presence of hotel employees at the franchisee locations, including Rileshkumar R. Patel, while continually profiting from B.S.'s sex trafficking activity from the ongoing venture.

121.    The United States Department of Homeland Security has long published the following ways of identifying sex trafficking:

❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?

❖ Has a child stopped attending school?

❖ Has the person had a sudden or dramatic change in behavior?

❖ Is a juvenile engaged in commercial sex acts?

❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?

❖ Does the person have bruises in various stages of healing?

❖ Is the person fearful, timid, or submissive?

❖ Does the person show signs of having been denied food, water, sleep, or medical care?

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

122. These commonsense inquiries should have been obvious to the hotel owner defendants, including Rileshkumar R. Patel, but also to the Wyndham Franchisors at all times.

123. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking."

124. The Wyndham Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.

125. However, it still does not appear that much of what the Wyndham Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including Rileshkumar R. Patel's location, through 2015 as the Wyndham Franchisors permitted the venture to continue so they could continue benefiting financially from B.S.'s actions.

126. The Wyndham Franchisors' lack of action permitted B.S. to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Wyndham Franchisors could continue to profit.

127. The Wyndahm Franchisors' lack of action to stop B.S. and acquiesced participation in the venture, despite the Wyndham Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including Rileshkumar R. Patel, have allowed Plaintiff

and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the Wyndham Franchisors' franchised premises.

128. It was incumbent on the Wyndham Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to B.S. and her sex trafficking venture -- instead of playing an integral role in its execution over the years -- and take reasonable steps to prevent their franchisees, including Rileshkumar R. Patel, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

129. By all appearances, the hotels at issue, including Rileshkumar R. Patel, in this case would not survive financially without the sex trafficking business writ large. The Wyndham Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorney Generals as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the Wyndham Franchisors.

130. Upon information and belief, the Wyndham Franchisors sent inspectors annually to grade each hotel, including Rileshkumar R. Patel. Those in-person inspections would have alerted the Wyndham Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, Rileshkumar R. Patel, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors who acted as agents of the Wyndham Franchisors provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including Rileshkumar R. Patel, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the Wyndham Franchisors acquiesced to their continued participation in a venture with B.S.

131. The Wyndham Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the Red Lion Franchisors' hotels, including Rileshkumar R. Patel's location, to which their names are associated.

132. Furthermore, Defendant's, Rileshkumar R. Patel, hotel ventures and each of the Wyndham Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including Rileshkumar R. Patel, about bookings, clear financial transactions for

the rooms, customer and guest surveys, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the Wyndham Franchisors' franchisees, including Rileshkumar R. Patel, among other similar things.

### 4. <u>Travel Lodge by Wyndham</u>

133. Plaintiff was also trafficked out the Travel Lodge by Wyndham ("Travel Lodge") at 2625 Ore Mill Road in Colorado Springs, B.S., Plaintiff, and the others in their group would stay at this hotel for several days each month (sometimes only two or three days; other times as many as two weeks).

134. Upon information and belief, during the times that Plaintiff was trafficked, the Travel Lodge was owned, operated, or controlled by Defendants, RK Hospitality LLC and Moisur Rahman, and was franchised by Wyndham or one of its affiliates.

135. During the time Plaintiff was trafficked, Defendants RK Hospitality LLC and Moisur Rahmanand Wyndham as franchisor, the Travel Lodge hotel, and the unnamed and unidentified employees thereof ("Travel Lodge Defendants") formed a business venture that participated in B.S.'s sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

136. At all relevant times, the above Travel Lodge Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

137. At all relevant times, the Travel Lodge Defendants had a continuous or repeat business relationship with B.S. wherein they rented multiple rooms to B.S. at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

138. At all relevant times, there were and are cameras throughout the hotel's public areas, including its hallways.

139.   On one occasion at the Travel Lodge, when Plaintiff threatened to leave, B.S. beat her, gave her a black eye and other visible bruises, and ordered her to isolate herself in her room for two weeks until she healed up.

140.   During this period, Plaintiff refused to allow housekeeping into her room. And only stepped outside once to asks the front desk staff for ice to apply to her black eye and bruises. Despite Plaintiff's obvious injuries and forced isolation, the Travel Lodge staff did not offer to call emergency services or even make a wellness check.

141.   There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

   a. On at least a dozen occasions, multiple rooms were booked as a block, typically under B.S.'s name, booked by B.S. alone, and paid for by B.S.;

   b. B.S. was armed and frequently disciplined the sex trafficking victims on the hotel property and prevented them from leaving;

   c. B.S. would frequently collect cash in the hotel's hallways or just outside the front door;

   d. Plaintiff was emaciated, rarely left without B.S. escorting Plaintiff, and she was forbidden from speak to other persons or with hotel staff;

   e. Plaintiff was dressed provocatively (by force);

   f. On each occasion, unregistered male visitors (two to three a day) entered Plaintiff's room (and the other rooms) one by one throughout the day, either after walking by the front desk or through the back door when the hotel left it unlocked, but always in full view of the hotel's cameras;

   g. Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

h. B.S frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring in the room, and the hotel staff must have noticed clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they finally entered the room.

142. The Travel Lodge was franchised by Wyndham Franchisors, during the time of the Plaintiff was trafficked at the location.

143. As part of the franchisor/franchisee contractual relationship, the Wyndham Franchisors did and still do exercise substantial control over RK Hospitality LLC and Moisur Rahman as their franchisee and is and are responsible for and have the contractual right to, among other things:

a. Create and define the safety standards that franchisees (i.e., RK Hospitality LLC and Moisur Rahman) are supposed to maintain;

b. Clearly communicate those standards to franchisees (i.e., RK Hospitality LLC and Moisur Rahman);

c. Create the materials for training franchisees (i.e., RK Hospitality LLC and Moisur Rahman) and their employees;

d. Provide some or all of the training to franchisees (i.e., RK Hospitality LLC and Moisur Rahman) or their employees;

e. Enforce the standards that franchisees (i.e., RK Hospitality LLC and Moisur Rahman) are supposed to maintain;

f. Hold the franchisees (i.e., Patel) to the standards that franchisees are supposed to maintain; and

g. Terminate and replace non-compliance franchisees (i.e., RK Hospitality LLC and Moisur Rahman).

144. Because of this relationship, the Wyndham Franchisors have the right to control and in fact do control whether the Travel Lodge Defendants or their other franchisees take reasonable actions to prevent sex trafficking.

145. The Wyndham Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., RK Hospitality LLC and Moisur Rahman) locations because of royalties, rents, and other monies subject to the Wyndham Franchisors' contractual relationship with the Travel Lodge Defendants or other franchisees.

146. The Wyndham Franchisors provide materials to train their franchisees, including the RK Hospitality LLC and Moisur Rahman, about the warning signs for sex trafficking within the hotels, and upon information and belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of RK Hospitality LLC and Moisur Rahman, and other franchisees.

147. The Wyndham Franchisors, upon information and belief, had a tacit agreement with B.S. to allow their venture with B.S. and to continue participating in the venture to continue profiting from the exploitation of the Plaintiff and other women by B.S. at the Wyndham Franchisors' franchisee locations, including RK Hospitality LLC and Moisur Rahman.

148. The failure of the Wyndham Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including RK Hospitality LLC and Moisur Rahman, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

149. Upon information and belief, the Wyndham Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the Wyndham Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including Patel, and their employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

150.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Wyndham Franchisors did nothing for eons.

151.    The Wyndham Franchisors are part of the "ventures" involving several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at the Travel Lodge location, but also providing the training and supervision to their franchisees, including RK Hospitality LLC and Moisur Rahman, thereby providing actual and constructive knowledge for the activities including B.S.'s sex trafficking of Plaintiff at the Travel Lodge, or the other franchisee locations.

152.    The Wyndham Franchisors participated in a venture with B.S. by permitting B.S. to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through her constant physical and verbal abuse in the presence of hotel employees at the franchisee locations, including Patel, while continually profiting from B.S.'s sex trafficking activity from the ongoing venture.

153.    The United States Department of Homeland Security has long published the following ways of identifying sex trafficking:

- ❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?
- ❖ Has a child stopped attending school?
- ❖ Has the person had a sudden or dramatic change in behavior?
- ❖ Is a juvenile engaged in commercial sex acts?
- ❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?
- ❖ Does the person have bruises in various stages of healing?
- ❖ Is the person fearful, timid, or submissive?
- ❖ Does the person show signs of having been denied food, water, sleep, or medical care?

❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

❖ Does the person appear to be coached on what to say?

❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

154. These commonsense inquiries should have been obvious to the hotel owner defendants, including RK Hospitality LLC and Moisur Rahman, but also to the Wyndham Franchisors at all times.

155. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking."

156. The Wyndham Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the Wyndham Franchisors will start doing to combat it more effectively.

157. The Wyndham Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.

158. However, it still does not appear that much of what the Wyndham Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including RK Hospitality LLC and Moisur Rahman's location, through 2015 as the Wyndham Franchisors permitted the venture to continue so they could continue benefiting financially from B.S.'s actions.

159. The Wyndham Franchisors' lack of action permitted B.S. to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Wyndham Franchisors could continue to profit.

160.     The Wyndham Franchisors' lack of action to stop B.S. and acquiesced participation in the venture, despite the Wyndham Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including RK Hospitality LLC and Moisur Rahman, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the Wyndham Franchisors' franchised premises.

161.     The Wyndham Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

162.     As such, it was incumbent on the Wyndham Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to B.S. and her sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, including RK Hospitality LLC and Moisur Rahman, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

163.     By all appearances, the hotels at issue, including RK Hospitality LLC and Moisur Rahman, in this case would not survive financially without the sex trafficking business writ large. The Wyndham Franchisors had actual and constructive knowledge, based on the various red flag warnings issued by local Attorney Generals as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the Wyndham Franchisors.

164.     Upon information and belief, the Wyndham Franchisors sent inspectors annually to grade each hotel, including RK Hospitality LLC and Moisur Rahman. Those in-person inspections would have alerted the Wyndham Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize— that the hotels, including RK Hospitality LLC and Moisur Rahman, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors who acted as agents of the Wyndham Franchisors provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including RK Hospitality LLC

and Moisur Rahman, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the Wyndham Franchisors acquiesced to their continued participation in a venture with B.S..

165.    The Wyndham Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the Wyndham Franchisors' hotels, including the Travel Lodge's location, to which their names are associated.

166.    Furthermore, the Travel Lodge hotel ventures and each of the Wyndham Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including RK Hospitality LLC and Moisur Rahman, about bookings, clear financial transactions for the rooms, customer and guest surveys, communicate online advertisements and reviews about the hotel, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the Wyndham Franchisors' franchisees, including Patel, among other similar things.

## 5.  America's Best Value Inn

167.    Plaintiff was also trafficked out the America's Best Value Inn ("America's Best") at 1780 Aeroplaza Drive in Colorado Springs, B.S., Plaintiff, and the others in their group would stay at this hotel for four or five days each month.

168.    Upon information and belief, during the times that Plaintiff was trafficked, the America's Best was owned, operated, or controlled by Defendant Haidden LLC ("Haidden") and was franchised by the Sonesta International Hotels Corporation ("Sonesta") as Franchisors.

169.    During the time Plaintiff was trafficked, Defendant Haidden, the Sonesta Franchisors, the America's Best hotel, and the unnamed and unidentified employees thereof ("America's Best Defendants") formed a business venture that participated in B.S.'s sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers.

170.    At all relevant times, the above America's Best Defendants were the agents of each other, if not the employees of each other, and were acting in the scope of their agency or employment.

171.    At all relevant times, the America's Best Defendants had a continuous or repeat business relationship with B.S. wherein they rented multiple rooms to B.S. at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women who were coerced into participating and thus were the victims of sex trafficking.

172.    At all relevant times, there were and are cameras throughout the hotel's public areas, including its hallways.

173.    There was no way for the front desk personnel and other employees not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff exhibited other obvious signs of being trafficked because:

    a.   On at least a dozen occasions, multiple rooms were booked as a block, typically under B.S.'s name, booked by B.S. alone, and paid for by B.S.;

    b.   B.S. was obviously armed while on the property, and frequently disciplined the sex trafficking victims on the hotel property and prevented them from leaving;

    c.   B.S. would frequently collect cash in the hotel's hallways or just outside the front door;

    d.   Plaintiff was emaciated, rarely left without B.S. escorting Plaintiff, and she was never allowed to speak to other persons or with hotel staff;

    e.   Plaintiff was dressed provocatively (by force);

    f.   On each occasion, unregistered male visitors (two to three a day) entered Plaintiff's room (and the other rooms) one by one throughout the day, either after walking by the front desk or through the back door when the hotel left it unlocked, but always in full view of the hotel's cameras;

    g.   Plaintiff was typically visibly drugged and incapacitated when entering and exiting the hotel and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity;

    h.   B.S frequently precluded hotel staff from entering the rooms while the sex trafficking was occurring in the room, and the hotel staff must have noticed

clear signs of commercial sex trafficking throughout the rooms, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia, when they finally entered the room.

174. The front desk staff at this hotel knew B.S. by name and assisted him in his sex trafficking venture by assigning R.Z and other victims to rooms and directing them there upon arrival. When B.S. dropped R.Z. off at this location, she did not need to check in or provide any identification. She would simply walk to the front desk and be provided a key and a room assignment.

175. In Augst 2015, while she was staying at the America's Best, Plaintiff once again told B.S. that could not handle it anymore and was leaving. B.S. then punched Plaintiff so hard in the nose that she was thrown off her chair. He then beat and strangled her to the point of unconsciousness.

176. When she came too, B.S. was gone and she tried to use her hotel room phone to call 911, but it was inoperable. She managed to work her way to the front desk of the hotel, where she asked the two employees there to call 911. They told her that they didn't want to "interfere in [B.S.'s] business" and they refused to call 911.

177. She limped back to her hotel room, where she hid in the closet overnight while in complete terror that B.S. would come back and kill her.

178. In the morning, she went to the front desk again, and fortunately there was a different employee there who called 911.

179. Plaintiff was transported by ambulance to the hospital, where she remained for three days. She stuttered for nearly three months after this beating, which was brought under control only with extensive speech therapy.

180. The police arrested B.S. for this assault, and he was eventually convicted and imprisoned. To this day, Plaintiff remains terrified than he will track her down and kill her for reporting the assault to the police.

181.    The America's Best was franchised by the Sonesta Franchisors, during the time of the Plaintiff was trafficked at the location.

182.    The America's Best was franchised by Defendant Sonesta or its affiliates (hereinafter "Sonesta Franchisors"), during the time of the Plaintiff was trafficked at the location.

183.    As part of the franchisor/franchisee contractual relationship, the Sonesta Franchisors exercised substantial control over Defendant Haidden as their franchisees and is and are responsible for and have the contractual right to, among other things:

   a.   Create and define the safety standards that franchisees (i.e., Haidden) are supposed to maintain;

   b.   Clearly communicate those standards to franchisees (i.e., Haidden);

   c.   Create the materials for training franchisees (i.e., Haidden) and their employees;

   d.   Provide some or all of the training to franchisees (i.e., Haidden) or their employees;

   e.   Enforce the standards that franchisees (i.e., Haidden) are supposed to maintain;

   f.   Hold the franchisees (i.e., Haidden) to the standards that franchisees are supposed to maintain; and

   g.   Terminate and replace non-compliance franchisees (i.e., Haidden).

184.    Because of this relationship, the Sonesta Franchisors had the right to control and in fact did control whether Defendant Haidden, or their other franchisees take reasonable actions to prevent sex trafficking.

185.    The Sonesta Franchisors received financial benefits from the renting of rooms and use of facilities at their sponsored franchisee (i.e., Haidden) locations because of royalties, rents, and other monies subject to the Sonesta Franchisors' contractual relationship with Defendants, Haidden, or other franchisees.

186.     The Sonesta Franchisors provided materials to train their franchisees, including Haidden, about the warning signs for sex trafficking within the hotels, and upon information and

belief, have some control, either expressly or implied, over the hiring, control, and regulation of employees of Haidden, and other franchisees.

187.    The Sonesta Franchisors, upon information and belief, had a tacit agreement with B.S. to allow their venture with B.S. and to continue participating in the venture to continue profiting from the exploitation of the Plaintiff and other women by B.S. at the Sonesta Franchisors' franchisee locations, including Haidden

188.    The failure of the Sonesta Franchisors to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train franchisees, including Haidden, on how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

189.    Upon information and belief, the Sonesta Franchisors regularly sent inspectors, both for planned and unplanned visits, to review, inspect, investigate, and maintain the premises operating as franchisees, including Haidden, to assert compliance with all Sonesta Franchisors standards and policies, even the sex trafficking prevention policies.

190.    Upon information and belief, the Sonesta Franchisors did not so much as (a) read police reports or online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution (or if the Sonesta Franchisors did, they ignored them entirely, which is even worse); (b) ask franchisees, including  and its employees questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (c) survey the hotels' guest population and activities for the same purpose.

191.    These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Sonesta Franchisors did nothing for eons.

192.    The Sonesta Franchisors are part of the "ventures" involving several hotels—owning and operating some during the relevant period that Plaintiff was trafficked at the America's BestDefendants' location, but also providing the training and supervision to their franchisees, including Haidden, thereby providing actual and constructive knowledge for the activities

including B.S.'s sex trafficking of Plaintiff at the America's Best Defendants' location, or the other franchisee locations.

193. The Sonesta Franchisors participated in a venture with B.S. by permitting B.S. to continue his sex trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through her constant physical and mental abuse in the presence of hotel employees at the franchisee locations, including the America's BestDefendants, while continually profiting from B.S.'s sex trafficking activity from the ongoing venture.

194. The guest(s) might exhibit signs of physical abuse such as: bruises, burns, scars, and/or malnourishment.

195. The United States Department of Homeland Security likewise has long published the following ways of identifying sex trafficking:

- ❖ Does the person appear disconnected from family, friends, community organizations, or houses of worship?
- ❖ Has a child stopped attending school?
- ❖ Has the person had a sudden or dramatic change in behavior?
- ❖ Is a juvenile engaged in commercial sex acts?
- ❖ Is the person disoriented or confused, or showing signs of mental or physical abuse?
- ❖ Does the person have bruises in various stages of healing?
- ❖ Is the person fearful, timid, or submissive?
- ❖ Does the person show signs of having been denied food, water, sleep, or medical care?
- ❖ Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?
- ❖ Does the person appear to be coached on what to say?
- ❖ Is the person living in unsuitable conditions?

❖ Does the person lack personal possessions and appear not to have a stable living situation?

❖ Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

196.    These commonsense inquiries should have been obvious to the hotel owner defendants, including Haidden, but also to the Sonesta Franchisors at all times.

197.    The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking."

198.    The Sonesta Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the Sonesta Franchisors will start doing to combat it more effectively.

199.    The Sonesta Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.

200.    However, it still does not appear that much of what the Sonesta Franchisors said they would do was done at all as trafficking of Plaintiff continued at all their franchised hotels, including this America's Best, through at least 2015 as the Sonesta Franchisors permitted the venture to continue so they could continue benefiting financially from B.S.'s actions.

201.    The Sonesta Franchisors' lack of action permitted B.S. to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Sonesta Franchisors could continue to profit.

202.    The Sonesta Franchisors' lack of action to stop B.S. and acquiesced participation in the venture, despite the Sonesta Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including Haidden, have allowed Plaintiff and other trafficked women to be injured both emotionally, mentally, and physically during their ordeal at the Sonesta Franchisors' franchised premises.

203.    The Sonesta Franchisors have thus known about these red flags of sex trafficking and guidelines for over a decade and have only recently acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it.

204.    As such, it was incumbent on the Sonesta Franchisors to take reasonable measures not to provide material support, lodging, or other aid or comfort to B.S. and his sex trafficking venture—instead of playing an integral role in its execution over the years—and take reasonable steps to prevent their franchisees, Haidden, from facilitating a sex trade business with a high likelihood of sex trafficking victimization.

205.    Upon information and belief, the Sonesta Franchisors sent inspectors annually to grade each hotel, including the America's Best Defendants. Those in-person inspections would have alerted the Sonesta Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including the Sonesta Defendants, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors who acted as agents of the Sonesta Franchisors provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchisee locations, including the America's Best Defendants, but since nothing changed in the sex trafficking and exploitation of Plaintiff, the Sonesta Franchisors acquiesced to their continued participation in a venture with B.S.

206.    Furthermore, Defendant Haidden LLC's hotel venture and each of the Sonesta Franchisors used interstate interactive computer services to book rooms, communicate with franchisees, including the America's Best Defendants, about bookings, clear financial transactions for the rooms, communicate online advertisements and reviews about the hotel, customer and guest surveys, take and collect payments and fees, communicate standards and reviews, and perform assessments about the hotel and the hotel's compliance with the Sonesta Franchisors' franchisees, including the America's Best Defendants, among other similar things.

## IV.

## CAUSES OF ACTION

207.    All conditions precedent have been satisfied.

208.    All of the aforementioned factual averments in this Complaint are incorporated by reference within each of the following causes of actions.

**A.   COUNT ONE: VIOLATION OF FEDERAL ANTI-TRAFFICKING STATUTE (18 U.S.C. § 1581 ET SEQ.)**

209.   Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

210.   Defendants have each (and among them jointly and severally) violated the Victims of Trafficking and Violence Protection Act, 18 U.S.C. § 1581 *et seq*., ("TVPRA") and therefore are liable to Plaintiff for compensatory damages, punitive damages, attorneys' fees, and costs.

211.   The Victims of Trafficking and Violence Protection Act of 2000, Public Law 106-386, as amended, declares as illegal the trafficking in persons, including forced labor, involuntary servitude, slavery, and sex trafficking.

212.   In addition to being a victim of a "severe form[] of trafficking" as it is defined under 22 U.S.C.S. §7102(11), Plaintiff was also "caused to engage in commercial sex act[s]" before she attained the age of 18 and for years thereafter. *See* 18 U.S.C.S. §1591(a).

213.   18 U.S.C. § 1591(a) makes it a crime to knowingly benefit, either financially or by receiving anything of value from participating in a venture that engages the trafficking of children, or the trafficking of adults by force, threat or coercion. 18 U.S.C. § 1591(a).

214.   18 U.S.C. § 1593A specifically makes it a violation of federal law to benefit financially or receive anything of value, from participating in a venture which has engaged in any act in violation of this chapter, with knowing or in reckless disregard of the fact that the venture has engaged in such violation.

215.   18 U.S.C. § 1594 makes it a violation of federal law to attempt to or conspire with another to violate certain statutes, including 18 U.S.C. § 1589, which criminalizes the obtaining of labor (or knowingly benefitting financially from participating in such a scheme when they knew or should have known of the trafficking) to obtain labor by a person by means of force, threats of force or physical restraint, serious harm or threats of serious harm, or the abuse of law or the legal process.

216.   18 U.S.C. § 1590 makes it a violation of federal law for one to "harbor" any person for labor or services in violation of this chapter.

217.    22 U.S.C § 7102(12) defines "sex trafficking" as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

218.    To "participat[e] in a venture" for purposes of the violation means "knowingly assisting, supporting, or facilitating" sex trafficking where "knowingly" means with awareness or being recklessly unaware. 18 U.S.C. § 1591(e)(4). A violation of this section includes "[w]hoever knowingly… benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act in violation of paragraph [(a)](1)" 18 U.S.C. § 1591(a)(2) *compare with* 18 U.S.C. § 1591(e)(4); *see also* 18 U.S.C. § 1591(a)(1) ("Whoever knowingly… recruits, entices, harbors, transports, provides obtains, advertises, maintains, patronizes, or solicits by any means a person…").

219.    18 U.S.C. § 1594(g) also declares that any such scheme "shall be considered an organized criminal activity or other serious offense..."

220.    18 U.S.C. § 1595 provides that Plaintiff may bring a civil action against each Defendant because each knowingly benefited, or attempted or conspired to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter, and may recover damages and reasonable attorneys' fees.

221.    Each of the hotel ventures knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purpose of having sex for money. They knew or should have known that even as an adult, she was not doing so of her free will and free from coercion—and their failure to know was the result of their own recklessness.

222.    Each Defendant benefited financially in at least the following ways:

      i.   Each Defendant hotel venture made money not only from Plaintiff but from the business model overall by harboring sex trafficking victims;

     ii.   Each Defendant hotel venture was able to rely on a constant stream of income not just from B.S.'s trafficking of Plaintiff and others and their

room rentals, but from the halo effect of others being a reliable source of income;

iii. Each Defendant hotel venture benefited financially from realizing the benefit of their hotel asset being more valuable on a financial basis due to the income that was generate;.

iv. Each of the Defendants, including the Wyndham, Red Lion, and Sonesta Franchisors, benefited financially from the royalites that were paid as part of the above-noted financial benefits to the hotels themselves, including the appreciation in the value of the franchisor's name and goodwill, and the fact that the brand was being projected to the public through signage and other advertisements.

223. There is no doubt that B.S. would not have been able to carry out his scheme to traffick Plaintiff without the participation of Defendants. Therefore, each Defendant is liable under Section 1595 of the TVPRA.

224. Each Defendant hotel venture was using a facility or means of interstate commerce, such as interstate wire communications via the internet and banking system, and so owned, managed, or operated an interactive computer service for all facets of its business, including performing banking, reservation, satisfaction surveys of guest, guest reviews and complaints, video surveillance, and communication with guests and non-guests.

225. Each Defendant hotel venture promoted or intentionally facilitated prostitution in its hotels, booking rooms and accepting payment for them year in and year out, with full knowledge that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of Plaintiff, then they were reckless in their lack of awareness.

226. Plaintiff is entitled to the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the decade she lost since she was first sex trafficked by B.S.; the fact that she was not able to make any money or have the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma,

shame and mental anguish from being a sex trafficking victim; and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries.

227. Plaintiff is further entitled to attorneys' fees for bringing this claim, as well as punitive damages and restitution.

228. Plaintiff pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act, Plaintiff's incapacity and inability to bring a claim until she became free of B.S.'s influence and threats which further tolls the statute of limitation, and because Defendants are estopped from raising the statute of limitations as a defense and any statute is equitably tolled because Plaintiff was unaware of her injury.

**B. COUNT TWO: VIOLATION OF PROMOTION OR FACILITATION OF SEX TRAFFICKING STATUTE (18 U.S.C. § 2421A ET SEQ.)**

229. Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

230. Defendants have each (and among them jointly and severally) violated the federal statute for promoting or facilitating prostitution and the recklessly disregard sex trafficking of victims, 18 U.S.C. § 2421A *et seq.*, and therefore are liable to Plaintiff for compensatory damages, punitive damages, attorneys' fees, and costs.

231. 18 U.S.C. § 2421A(b) make it a violation of federal law for one to use an interactive computer service (or who attempts to do so) "with the intent to promote or facilitate the prostitution of another person" and acts in reckless disregard that such conduct contributed to sex trafficking.

232. 18 U.S.C. § 2421A(c) authorizes a civil action separately from § 1595 for damages and attorneys' fees for any person injured by reason of a violation of § 2421A(b), and subsection (d) requires the imposition of mandatory restitution.

233. Section 230 of the Communications Decency Act provides no defense to an action under § 2421A(b) and (c).

234. Each of the hotel ventures knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purpose of having sex for money. They knew or

should have known that even as an adult, she was not doing so of her free will and free from coercion—and their failure to know was the result of their own recklessness.

235.    Each Defendant benefited financially in at least the following ways:

    i.    Each Defendant hotel venture made money not only from Plaintiff but from the business model overall by harboring sex trafficking victims;

    ii.    Each Defendant hotel venture was able to rely on a constant stream of income not just from B.S.'s trafficking of Plaintiff and others and their room rentals, but from the halo effect of others being a reliable source of income;

    iii.    Each Defendant hotel venture benefited financially from realizing the benefit of their hotel asset being more valuable on a financial basis due to the income that was generate;.

    iv.    Each of the Defendants, including the Wyndham, Red Lion, and Sonesta Franchisors, benefited financially from the royalites that were paid as part of the above-noted financial benefits to the hotels themselves, including the appreciation in the value of the franchisor's name and goodwill, and the fact that the brand was being projected to the public through signage and other advertisements.

236.    There is no doubt that B.S. would not have been able to carry out her trafficking scheme Plaintiff without the participation of Defendants. Therefore, each Defendant is liable under 18 U.S.C. 2421A *et seq*.

237.    Each Defendant hotel venture was using a facility or means of interstate commerce, such as interstate wire communications via the internet and banking system, and so owned, managed, or operated an interactive computer service for all facets of its business, including performing banking, reservation, customer satisfaction surveys, customer reviews, video surveillance, and communication with guests and non-guests.

238.    Each Defendant hotel venture promoted or intentionally facilitated prostitution in its hotels, booking rooms and accepting payment for them year in and year out, with full knowledge

that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of Plaintiff, then they were reckless in their lack of awareness.

239.   Plaintiff is entitled to the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to decade she lost since she was first sex trafficked by B.S.; the fact that she was not able to make any money or have the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame and mental anguish from being a sex trafficking victim; and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries.

240.   Plaintiff is further entitled to attorneys' fees for bringing this claim, as well as punitive damages and restitution.

241.   Plaintiff pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act, Plaintiff's incapacity and inability to bring a claim until she became free of B.S.'s influence and threats which further tolls the statute of limitation, and because Defendants are estopped from raising the statute of limitations as a defense and any statute is equitably tolled because Plaintiff was unaware of her injury.

## C.   COUNT THREE: COLORADO REVISED STATUTE § 13-21-127 (AGAINST ALL DEFENDANTS)

242.   Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

243.   Plaintiff is the victim of sex trafficking as defined in C.R.S. § 18-3-502(12), and entitled to bring a claim under C.R.S. § 13-21-127.

244.   C.R.S. § 13-21-127, incorporates C.R.S. § 18-3-503 as the predicate violation, which makes it illegal to "knowingly sells, recruits, harbors, transports, transfers, isolates, entices, provides, receives, or obtains by any means another person for the purpose of coercing the other person to perform labor or services commits human trafficking for involuntary servitude."

245.   Each Defendant hotel venture knowingly harbored Plaintiff for the purpose of coercing her to perform sex services.

246. Each Defendant hotel venture knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purpose of having sex for money, and that even as an adult, she was not doing so of her free will free and from coercion.

247. There is no doubt that B.S. would not have been able to carry out his trafficking scheme of Plaintiff without the participation of Defendants, because the Defendant's harboring of Plaintiff was critical to B.S. trafficking venture. Had Defendants not harbored Plaintiff, B.S. would have neem unable to execute his sex trafficking venture.

248. Each Defendant hotel venture intentionally facilitated or knowingly promoted prostitution in its hotels with full knowledge that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of Plaintiff, then they were reckless in their lack of awareness.

249. Each Defendant is therefore liable to Plaintiff for the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the decade she lost since she was first sex trafficked by B.S. and the fact that she lost earnings while being trafficked,; the fact that she never had the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame, and mental anguish from being a sex trafficking victim; and the pain, suffering and physical scars of her plight and her extreme emotional distress and physical injuries.

250. Plaintiff is further entitled to attorneys' fees and actual costs for bringing this claim, as well as treble damages, punitive damages, and restitution.

251. Plaintiff pleads that this action is timely as to all pleaded occurrences due to Plaintiff's incapacity and inability to bring a claim until she became free of B.S.'s influence and threats, due to the continuing tort doctrine, and because Defendants are estopped from raising the statute of limitations as a defense. Thus, Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable tolling, estoppel and under C.R.S § 13-21-127.

### D.  COUNT FOUR: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)

252.    Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

253.    At all times relevant, each of the Defendant hotel ventures acted through their agents and employees, and the Wyndham, Red Lion, and Sonesta Franchisors were the agents of their respective franchisee hotels (or vice-versa), and their acts and omissions were all in the scope of their employment or agency.

254.    Because Plaintiff was a hotel guest at each hotel venture's respective hotel property, each Defendant had a duty of care to take reasonable precautions not to harbor or provide a safe haven for the sex trade and thus sex trafficking. Without limiting the generality of the foregoing, Defendants had a duty to:

    a.  Have knowledge of the signs of sex trafficking;

    b.  Have an awareness of the degree of prostitution taking place in their hotels;

    c.  Recognize when women or underage girls could be the victims of sex trafficking;

    d.  Provide adequate incentives to hotel employees not to acquiesce to or, worse, facilitate the sex trade in their hotels;

    e.  Provide adequate training to hotel employees to avoid facilitating sex trade businesses and prostitution in their hotels in states where prostitution is illegal;

    f.  Properly train employees for dealing with suspected prostitution or sex-trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

    g.  Properly monitor and record their hotels' public areas via cameras to ensure the safety of their guests; and

    h.  Recognize when a guest is under the influence of substances or otherwise incapacitated to the point of not being in control of themselves and, therefore, unable to escape or consent to any sexual activity.

255.    Each Defendant breached their duty.

256.    Each Defendant knew or should have known of the risks to Plaintiff.

257.    Each Defendant knew or should have known of the emotional distress and abuse suffered by Plaintiff due to the force, manipulation, and exploitation by B.S. in the presence of each Defendant, or their agents, servants, or employees, in the sex trafficking plan, scheme, or venture.

258.    At all times herein mentioned, Defendants and each of them knew of the regulations and laws cited herein, and knew that the well-being and health of their guests were at risk whenever they failed to meet such duties.

259.    Each Defendant hotel venture knew or should have known that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to Plaintiff and others like her.

260.    Each Defendants' actions (whether directly or through their agents or employees) were done with knowledge or reckless disregard of what was occurring to Plaintiff, and Defendants' employees' active participation in allowing Plaintiff to be used in the sex trade and sex trafficked is outrageous conduct. Defendants' conduct alleged herein demonstrates reckless disregard for Plaintiff, her health and safety, and her plight. Thus, Defendants' despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

261.    As a further result of Defendants' conduct, Plaintiff was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness, and desperation for *years*.

262.    Each Defendant acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was being subjected to B.S.'s abusive conduct, both physical and emotional. Each Defendant was well aware of the propensity for abuse and violence taking place in their hotels.

263.    Plaintiff has suffered a decade's worth of severe emotional distress, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with it for

the rest of her life. She lacks the means and insurance to seek proper treatment. Each Defendant's acts and omissions were a substantial factor in causing Plaintiff's severe emotional distress.

264. Each Defendant's acts or omissions were the result of oppression or malice against Plaintiff because they were recklessly indifferent to Plaintiff's wellbeing.

265. Plaintiff pleads that this action is timely as to all pleaded occurrences due to Plaintiff's incapacity and inability to bring a claim until she became free of B.S.'s influence and threats, due to the continuing tort doctrine, and because Defendants are estopped from raising the statute of limitations as a defense. Thus, Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable tolling, estoppel, and under applicable Colorado State Statues.

266. Plaintiff seeks all compensable damages, punitive damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

**E. COUNT FIVE: NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)**

267. Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

268. Each Defendant owed Plaintiff a duty of care to take reasonable measures to ensure that she was not being subjected to sex trafficking and criminal abuse, including physical and mental abuse, on their premises.

269. Each Defendant breached this duty.

270. At all times relevant, each of the Defendant hotel ventures acted through their agents and employees, and the Wyndham, Red Lion, and Sonesta Franchisors were the agents of their respective franchisee hotels (or vice-versa), and their acts and omissions were all in the scope of their employment or agency.

271. Because Plaintiff was a hotel guest at each hotel venture's respective hotel property, each Defendant had a duty of care to take reasonable precautions not to harbor or provide a safe haven for sex trafficking or forced prostitution. Without limiting the generality of the foregoing, Defendants had a duty to:

a. Have knowledge of the signs of sex trafficking;

b. Have an awareness of the degree of the sex trade businesses taking place in their hotels;

c. Recognize when women or underage girls could be the victims of sex trafficking;

d. Provide adequate incentives to hotel employees not to acquiesce to or, worse, facilitate the sex trade in their hotels;

e. Provide adequate training to hotel employees to avoid facilitating prostitution in their hotels in states where prostitution is illegal;

f. Properly train employees for dealing with suspected prostitution or sex-trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

g. Properly monitor and record their hotels' public areas via cameras to ensure the safety of their guests; and

h. Recognize when a guest is under the influence of substances or otherwise incapacitated to the point of not being in control of themselves and, therefore, unable to escape or consent to any sexual activity.

272. Each Defendant knew or should have known of the risks to Plaintiff. At all times herein mentioned, Defendants and each of them knew of the need for the regulations and laws and that the lives and health of their guests were at risk whenever they failed to meet such duties.

273. Each Defendant hotel venture knew or should have known that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to Plaintiff and others like her.

274. Each Defendant's actions or omissions (whether directly or through their agents or employees) were done with negligent disregard of what was occurring to Plaintiff, and Defendants' employees' outrageous conduct in allowing Plaintiff to be prostituted or sex trafficked. Defendants' conduct alleged herein demonstrates negligent disregard for Plaintiff, her health and

safety, and her plight. Thus, Defendants' despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

275.   Each Defendant acted with negligent disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was being subjected to B.S.'s abusive conduct— physical, emotional, and mental. Each Defendant was well aware of the propensity for abuse and violence taking place in their hotels. As a result of Defendants' conduct, Plaintiff was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness and desperation for *years.*

276.   Plaintiff has suffered a decade's worth of severe emotional distress, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with it for the rest of her life. She lacks the means and insurance to seek proper treatment.  Each Defendant's acts and omissions were a substantial factor in causing Plaintiff's severe emotional distress.

277.   As a direct and proximate result of the acts or omissions of Defendants, Plaintiff sustained severe and serious harm, including, but not limited to, severe emotional distress, all to her damage in a sum within the jurisdiction of this Court and to be shown according to proof.

278.   Due to their negligence, each Defendant is therefore liable to Plaintiff for the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the decade she lost since she was first sex trafficked by B.S. and the fact that she never had the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame and mental anguish of being a sex trafficking victim; and her pain, suffering and physical scars of her plight, and her extreme emotional distress and physical injuries, including, but not limited to, her knocked out teeth and broken arm.

279.   All such damages are the foreseeable and proximate result of Defendants' acts or omissions.

280.   Each Defendant's acts and omissions proximately caused Plaintiff to suffer and continue to suffer anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, such that an ordinary, reasonable person would be unable to cope with it.

281.    Plaintiff continues to have trouble obtaining work or sustaining herself financially.

282.    Each Defendant's negligent acts or omissions were a substantial factor in causing Plaintiff's severe emotional distress.

283.    Plaintiff's causes of action are timely under the doctrines of continuing tort tolling, disability, equitable tolling, estoppel, and under applicable Colorado State Statutes.

284.    Plaintiff seeks all compensable damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

## F.  Count Six: Negligence (All Defendants)

285.    Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

286.    Each Defendant, including Wyndham, Red Lion, and Sonesta Franchisors, owed Plaintiff a duty of care to take reasonable measures to ensure that she was not being subjected to sex trafficking and criminal abuse, both physical and mental abuse, on their premises.

287.    Each Defendant also owed a duty to the Plaintiff to use reasonable care to ensure the safety, care, wellbeing, and health of Plaintiff while she was on each Defendants' respective premises.

288.    Further, each Defendant's duties encompassed the hiring, screening, appointment, retention, training, or supervision of their employees that would otherwise provide a safe environment for Plaintiff at the hotels owned, operated, controlled, managed, or maintained by the Defendants at their respective premises.

289.    Each Defendant knew or should have known from the open and obvious signs of that Plaintiff was a victim of sex trafficking or a victim of each Defendant's participation in a venture with B.S.'s sex trafficking scheme.

290.    Defendants breached their duty of care to Plaintiff and were negligent, careless, or reckless for failing to protect the Plaintiff from their participation in the venture they engaged in with B.S. and failing to prevent Plaintiff's ordeal from continuing.

291. Defendants knew or should have known, based on the obvious and visible signs that the Plaintiff was being abused, assaulted, controlled, manipulated, drugged, forced, coerced, and otherwise exploited—sexually or otherwise—while at the Defendants' hotels.

292. Despite the Defendants' knowledge, either actual or constructive, regarding the sexual exploitation and trafficking of Plaintiff, Defendants took no remedial action, did not conduct a good faith investigation, or did not take any other actions whatsoever to ensure the health, safety, and wellbeing of Plaintiff on the Defendants' premises.

293. At all times relevant to this Complaint, Defendants had grossly inadequate policies and procedures to protect sex trafficking victims, including Plaintiff.

294. As a direct and proximate cause of the Defendants' negligence, whether gross, careless, or reckless, Plaintiff was sex trafficked, sexually exploited, physically abused, mentally abused, assaulted, and continually victimized at the Defendants' hotels.

295. The actions, omissions, commissions, or lack thereof of each Defendant named in this Complaint (and among them jointly and severally), constitute negligence and said negligence as outlined in this Complaint is the cause of Plaintiff's injuries and damages.

296. Plaintiff has been injured and damaged under common law negligence, as well as all applicable state and federal laws, statutes, or regulations for negligence, due to the continual ordeal Plaintiff was forced to endure at the hands of each Defendant and B.S..

297. Additionally, in addition to the general claims of negligence in this count, to the extent that any Defendant is found not to be directly liable, they are liable for Counts 1 through 6 under one or more of the following doctrines and theories of liability:

298. **Aiding and Abetting**:

   a. Each Defendant gave substantial assistance, comfort or encouragement to B.S. to perpetrate his scheme and violence against Plaintiff. Each Defendant, directly or through one or more of its employees actively took part in Plaintiff's trafficking, or furthered it by cooperating with B.S., or ratified and adopted her actions so that the ventures could make money, avoid detection, and continue as a business; and

b. Each Defendant's conduct was a substantial factor in causing harm to Plaintiff and perpetuating her trafficking because without the hotels' housing the sex trafficking would not have occurred.

299. **Respondeat Superior/ Vicarious Liability/ Principal-Agent:**

a. Each of the named Defendants herein acting through their agents or employees are liable for the acts and omissions of their agents or employees giving rise to liability;

b. For each of the respective Defendant hotel ventures described herein, the owners, employees and, as applicable, franchisors were the agents of each other, if not the employees of each other, and at all times were acting in the scope of their agency or employment;

c. For the hotel employees, their tortious conduct is chargeable to the hotel owners because their acts or omissions were in the scope of their employment in a way that was inherent in their employment duties and was conduct that was a natural outgrowth of their employment duties under the risk-of-the-enterprise doctrine; and

d. The Wyndham, Red Lion, and Sonesta Franchisors are vicariously liable for the acts or omissions of their own employees and agents as well as their acts or omissions of their franchisees.

300. **Joint Enterprise:**

a. The Wyndham, Red Lion, and Sonesta Franchisors are vicariously liable for the acts or omissions of their franchisees and vice versa under the theory of joint enterprise liability;

b. The Wyndham, Red Lion, and Sonesta  Franchisors (in their capacity as such) formed a joint venture with their respective franchisee hotel ventures because (i) each intended to combine their relative property, skills, knowledge, and operations of the hotel for the purposes of carrying out a single business (namely, the franchised hotel business at issue); (ii) the Wyndham, Red Lion,

and Sonesta  Franchisors and each of their respective franchisees had a relevant ownership interest in the franchised hotel business; (iii) the Wyndham, Red Lion, and Sonesta  Franchisors and their franchisee had a right to control the business—per their franchise agreements, the hotel owners/franchisees controlled the day-to-day operations while the Wyndham, Red Lion, and Sonesta  Franchisors controlled the macro aspects of the business, and had the right to take control of the franchised hotel business; and (iv) upon information and belief, they shared the profits and each shared losses in that they bore, at a minimum some or all of their respective unrecouped costs if the business never made a profit; and

c. Each joint enterprise is alleged to have been made actually and by apparent authority to Plaintiff.

301. **Concerted Action**:

a. The Wyndham, Red Lion, and Sonesta  Franchisors are vicariously liable for the acts or omissions of their franchisees and those franchisees' employees and agents, and vice versa under the theory of concerted action;

b. The Wyndham, Red Lion, and Sonesta  Franchisors within each venture worked towards a common goal of building and maintaining the hotel business at each respective hotel;

c. Each Defendant, including the Wyndham, Red Lion, and Sonesta  Franchisors, knew that they were engaging in and materially assisting a sex trade operation in their hotels, which they knew or should have known could violate a duty of care owed to the Plaintiff;

d. The Wyndham, Red Lion, and Sonesta  Franchisors (in their capacity as such) intended to combine their relative property, skills, knowledge, and operations of the hotel for the purposes of carrying out a single business (namely, the franchised hotel business at issue); the Wyndham, Red Lion, and Sonesta  Franchisors and each of their respective franchisees had a relevant ownership

interest in the franchised hotel business; each of the Wyndham, Red Lion, and Sonesta Franchisors and their respective franchisee had a right to control the business—per their franchise agreements, the hotel owners/franchisees controlled the day-to-day operations while the Wyndham, Red Lion, and Sonesta Franchisors controlled the macro aspects of the business, and had the right to take control of the franchised hotel business; and upon information and belief, they shared the profits and each shared losses in that they bore, at a minimum, some or all of their respective unrecouped costs if the business never made a profit.

302.    **Franchisor-Franchisee Negligence**: The Wyndham, Red Lion, and Sonesta Franchisors are further liable for the acts and omissions of their franchisees due to the Choice Franchisors' respective negligent failure to (i) identify the proper operators to serve as respective franchisees; (ii) train their respective franchisees; (iii) create and implement anti-trafficking measures; and (iv) train and monitor their respective franchisees' compliance with said measures.

303.    As to each Defendant, including the Wyndham, Red Lion, and Sonesta Franchisors, who contends they did not personally commit any of the acts that would give rise to liability, it is pleaded that said Defendant is liable through one or more of the above doctrines.

304.    Under the above doctrines and Negligence Counts, each Defendant is liable for Plaintiff's harm.

305.    Each Defendant's acts or omissions under one or more of the above doctrines and theories were a substantial factor in causing harm to Plaintiff and perpetuating Plaintiff's trafficking.

306.    Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable and continuing tort tolling, estoppel, and under applicable Colorado State Statutes.

307.    Plaintiff seeks all compensable damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

**V.**

**JURY DEMAND**.

308.    Plaintiff requests a trial by jury on all issues triable to a jury.

**VI.**

**PRAYER FOR RELIEF**

309.    Plaintiff respectfully requests judgment in Plaintiff's favor awarding Plaintiff:

a.    A protective order of confidentiality and sealing and protecting Plaintiff's identity;

b.    Actual damages in an amount to be determined by the trier of fact;

c.    Compensatory damages, whether direct or indirect, in an amount to be determined by the trier of fact;

d.    Punitive damages to be determined by the trier of fact;

e.    Restitution and/or disgorgement in an amount to be determined by the trier of fact;

f.    Attorneys' fees and costs; and

g.    Any other legal or equitable relief to which Plaintiff is justly entitled.


DATED: August 15, 2025                    Respectfully submitted,

s/ Chris Cowan
Chris Cowan, #48434
R. CHRISTOPHER COWAN, ESQ., LTD.
P.O. Box 512
813 Main Avenue, Suite 209
Durango, CO 81302
Phone: 970-880-8900
Fax: 214-853-5800
Email: chris@cowan.ltd